SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #203
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com
*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

SHAWN MEEHAN, an individual, JANINE HANSEN, and individual, LYNN CHAPMAN, an individual, MELISSA CLEMENT, an individual,

   Plaintiffs,

  vs.

STEPHEN F. SISOLAK, in his official capacity as Governor of the State of Nevada, AARON DARNELL FORD, in his official capacity as the Attorney General of the State of Nevada, BRENDA ERDOES, in her official capacity as Head of Legislative Counsel Bureau, NICOLE CANNIZZARO, in her official capacity as Chair of the Legislative Commission, DOES 1 through 100.

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No: 2:21-cv-260-JAD-EJY**

**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

## DECLARATION OF SIGAL CHATTAH, ESQ. PURSUANT TO LR 7-4

I, SIGAL CHATTAH, declare as follows:

1.  I am a licensed attorney in the State of Nevada since 2002 and a member of good standing with the State Bar of Nevada.

2.  I am Plaintiffs' Counsel in the matter *sub judice* and admitted to practice in all Courts of the State of Nevada including the United States District Court.

3.  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I would and could competently do so under oath.

4.  The matter *sub judice* involves the arbitrary and delayed reopening of the State Capital building to allow Plaintiffs' access to same to engage in their constitutional rights to lobby the legislative officials, staff and others.

5.  On February 1, 2021, the 81st Legislative Session began in Carson City, Nevada and Plaintiffs are precluded from entering the building in violation of their United States and State of Nevada constitutional rights.

6.  Movants herein are four individuals, on behalf of themselves, seek entry to the State Capital Building to engage in lobbying activities.

7.  That the First Amendment Freedom to Petition the Government and Freedom of Speech are subject to strict scrutiny review and Defendants have failed to demonstrate that the closure of the State Capital is necessary to further a compelling State Interest.

8.  That Defendants refusal to open the State Capital based on an Emergency Directive issued on March 12, 2020, is no longer an Emergency Directive, eleven months thereafter but an arbitrary and capricious abuse of power.

2

9.      That employees of the State have been prioritized to receive the COVID-19 vaccines.

10.      According to the Center for Disease Control (CDC) [1], as of the date of this Emergency Motion the State of Nevada has received 719,880 CVOID-19 vaccines and has distributed 598,423 COVID-19 vaccines, leaving over 100,000 vaccines available for use for State Capital employees, which are number at under 1,000 employees.

11.      That there is nothing precluding the vaccination of employees of the State Capital and therefore, the reopening of the building to allow Plaintiffs to engage in lobbying.

12.      That Plaintiffs seek an Order from this Court, instructing Defendants to immediately open the State Capital and allow for Plaintiffs access to the State Capital for the purposes of lobbying as protected by the First Amendment to the United States and Nevada Constitutions.

13.      That due to the exigency of the 81st Legislative Session being only 120 days, with 23 days already passing, this Motion for Preliminary Injunction must be heard in an expedited manner.

14.      That due to the exigency in the reopening of the State Capital and constitutional violations and implications herein, it is simply impracticable to contact each administrator and Defendant involved in this action. Notwithstanding same, service of process of the Complaint, and the following

_____

[1] https://covid.cdc.gov/covid-data-tracker/#vaccinations

Emergency Motion for Preliminary Injunction will be personally served upon Defendants upon filings or shortly thereafter.

15.    These are the facts as I know them to be true.

16.    Under NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of February, 2021

_/s/   _Sigal Chattah___
Declarant
SIGAL CHATTAH, ESQ.

1
2
## TABLE OF CONTENTS
3
TABLE OF AUTHORITIES ................................................................................... 6-9
4
I.      MOTION FOR PRELIMINARY INJUNCTION…………………………………10-34
5
II.     JURISDICTION ……………………………..……………………………...12
6
III.   STATEMENT OF FACTS ........................................................................12-19
7
8
IV.   LEGAL ARGUMENT ..........................................................................19-32
9
    A.  STANDING
10
    B.  ISSUE OF FIRST IMPRESSION
11
    C.  STANDARD FOR INJUNCTION
12
        *1.  Likelihood of Success on the Merits*
13
    D.  DEFENDANTS CONSTITUTIONAL VIOLATIONS
14
            1.     Free Speech/Petition Clause
15
16
            2.     Strict Scrutiny Review
17
            3.     Violation of Article 4, § 15 of Nevada Constitution
18
    E.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM
19
    F.     BALANCE OF EQUITIES FAVORS PLAINTIFF
20
21
    G.    INJUNCTION IS IN THE PUBLIC INTEREST
22
V.     CONCLUSION……………………………………………………………….33-34
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**CASES**                                                                                    **PAGE(S)**

*Aces Enterprises LLC v Edwards 0:20-cr-30526*                                                  20

*ACLU v. Holder, 673 F.3d 245 (4th Cir. 2011)*                                                  28

*Adams and Boyle, P.C. v Slatery, 0:20-cv-00705*                                                20

*Adrian School District Board v. Gill; 20CV31597*                                               20

*Am. Trucking Ass'ns v. City of Los Angeles,*                                                  23,24
*559 F.3d 1046, (9th Cir. 2009)*

*Assoc. Press v. Otter, 682 F.3d 821 (9th Cir. 2012)*                                          24,25

*BE&K Constr. Co. v. NLRB, 536 U.S. 516 (2002)*                                                 11

*Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014)*                                      32

*Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)                  25

*Buckley v. Valeo, 424 U.S. 1 (1976)*                                                           27

*Calvary Chapel Dayton Valley v Sisolak*, 591 U.S. ___(2020)                                    20

*Casey v. City of Newport, R.I., 308 F.3d 106 (1st Cir. 2002)*                                  31

*City of Los Angeles v. Lyons, 461 U.S. 95 (1983)*                                              19

*Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013)*                                             19

*Clements v Airport Authority of Washoe County, 69 F.3d 321 (9th Cir. 1995)*                  23

*Edge v. City of Everett, 929 F.3d 657 (9th Cir. 2019)*                                         21

*Dhiab v. Trump, 852 F.3d 1087 (D.C. Cir. 2017)*                                                28

*Duncan v. Louisiana*, 391 U.S. 145 (1968)                                                      24

*Elrod v. Burns, 427 U.S. 347 (1976)*                                                          24,30

*Ex Parte Young, 209 U.S. 123 (1908)*                                                           12

*Fed. Election Comm'n v. Furgatch, 869 F.2d 1256 (9th Cir. 1989)*     26

*Free the Nipple v, City of Ft. Collins, Colo, 916 F.3d 792 (2019)*     32

*Gerritsen v. City of Los Angeles, 994 F.2d 570 (9th Cir. 1993)*     30

*Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir. 1999)*     30

*Gitlow v New York* 268 US 652 *(1925)*     26

*Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir. 2013)*     32

*Index Newspapers v. U.S Marshals, Service, No. 20-35739 (9th Cir. 2020)*     25

*In re Zappos.com, Inc., 888 F.3d 1020 (9th Cir. 2018)*     19

*Int'l Molders' & Allied Workers' Local Union v. Nelson,*     21
*799 F.2d 545 (9th Cir. 1986)*

*Jacobson v. Massachusetts, 197 U.S. 11 (1905)*     33

*Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)*     19

*Mastrovincenzo v. City of New York, 435 F.3d 78 (2d Cir. 2006)*     30

*McDonald v. Smith, 472 U.S. 479 (1985)*     22

*Melendres v. Arpaio, 695 F.3d 990 (9th Cir. 2012)*     23

*Meyer v. Grant, 486 U.S. 414 (1988)*     31

*Morrison Road Corp v. Tri-County Health Dept 2020-cv-31347*     21

*NAACP v. Button, 371 U. S. 415 (1963)*     11,12

*NRDC v. Winter, 555 U.S. 7 (2008)*     22

*O'Shea v. Littleton, 414 U.S. 488 (1974)*     19

*Padilla v. Immigration &. Customs Enforcement, 953 F.3d 1134 (9th Cir. 2020)*     24

*Press-Ent. Co. v. Superior Court of Cal., 478 U.S. 1 (1986)*     25

*Prince v. Massachusetts, 321 U.S. 158 (1944)*     33

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,*     11

*508 U.S. 49 (1993)*

*Railroad Trainmen v. Virginia Bar, 377 U. S. 1 (1964)*                                                     11

*Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980)*                                        24

*Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)*                                                              27

*Roman Catholic Diocese of Brooklyn New York, v*                                                        21
*Andrew M. Cuomo, Governor of New York, 592 U.S. _____(2020)*

*Sammartano v. First Judicial Dist. Court, 303 F.3d 959 (9th Cir. 2002)*                          25

*Shanks v Dessel, 540 F.3d 1082 (9th Cir. 2008)*                                                            22

*Sierra Forest Legacy v. Rey, 577 F.3d 1015 (9th Cir. 2009)*                                          23

*South Bay United Pentecostal Church v Newsom, 590 U.S. __(2020)*                            21

*Susan B. Anthony List v. Driehaus, 573 U.S. 149 (2014)*                                               19

*Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914 (9th Cir. 2003)*              21

*Texas v. Johnson, 491 U.S. 397 (1989)*                                                                        27

*United States v. California, 921 F.3d 865 (9th Cir. 2019)*                                             21

*United States v. Harriss, 347 U.S. 612 (1954)*                                                             11

*U.S. v. Index Newspapers LLC, 766 F.3d 1072 (9th Cir. 2014)*                                     28

*United Mine Workers of America, District 12 v. Illinois State Bar Association Et Al.,*       11
*389 U.S. 217 (1967)*

*W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)*                                   27

*Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008)*              21,23,25
                                                                                                                         30-32

**STATUTES**

A.        42 U.S.C. §1983

B.        U.S. Const. Amends. I, V, XIV

C.        Nevada Constitution Article I § 1, 9, 10

D.        Nevada Constitution Article IV § 15

E.       Nevada Constitution Article V § 9,

F.       NRS 218E.150

G.       NRS 218H.080 *Et seq.*

**URL SOURCES**

https://covid.cdc.gov/covid-data-tracker/#vaccinations

https://www.freedomforuminstitute.org/first-amendment-center/

**<u>MISC. SOURCES</u>**

Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425, 1485-86 (1987)

BLACK'S LAW DICTIONARY 243 (9th ed. 2004)

*Empirically Testing Dworkin's Chain Novel Theory: Studying the Path of Precedent*, 80 NYU L. Rev. 1156 (2005) [Path of Precedent].

John Norton Pomeroy, *A Treatise On Equity Jurisprudence as Administered in the United States of America Adopted for All the States and to the Union of Legal and Equitable remedies Under the Reformed Procedure* § 423 (Spencer W. Symons ed., 5th ed. 1941).

## MOTION FOR PRELIMINARY INJUNCTION

COME NOW, PLAINTIFFS, SHAWN MEEHAN *Et Al*, by and through the undersigned attorney of record, SIGAL CHATTAH, ESQ., of the CHATTAH LAW GROUP, and pursuant to Fed. R. Civ. Pro. 65, hereby move this Court for a preliminary injunction against Defendants, to enjoin them from dilatory and arbitrary closure of the State Capital building precluding Plaintiffs (and others) from engaging in constitutional lobbying efforts.

The purpose of this motion is made on an emergency basis, given the fact that it has been over three weeks since the 81st Legislative Session has started and the State Capital building has been closed, citing to the Governor's Emergency Orders on March 12, 2020, over eleven months ago.

At this juncture, there is no longer an Emergency, but an obvious abuse of arbitrary and capricious power to deny access to the public of the Legislative Process, denying Plaintiffs' constitutional rights.

Notwithstanding same, since December 15, 2020, the State of Nevada has access to both the Pfizer and Moderna vaccines and has prioritized State and Government employees for receiving the vaccines with over 598,423 vaccines distributed in the State as of the date of this Motion. Plaintiffs' Motion is based upon the pleadings and papers on file herein, the Exhibits attached and Declarations filed concurrently herewith, and the following points and authorities.

## INTRODUCTION

The Petition section of the First Amendment, also commonly referred to as the Petition Clause, states that "People have the right to appeal to government in favor of or against policies that affect them or in which they feel strongly.  This freedom includes the right to

gather signatures in support of a cause and to lobby legislative bodies for or against legislation," *(Copley, First Amendment Center)*.

A more simple definition of the right to petition, is "the right to present requests to the government without punishment or reprisal.  This right is guaranteed in the First Amendment to the U.S. Constitution" *(History Central, 1)*.

Looking at the specific definition of the word *petition*, as it relates to the freedom of petition and the First Amendment, the word can be used to describe "any nonviolent, legal means of encouraging or disapproving government action, whether directed to the judicial, executive or legislative branch.  Lobbying, letter-writing, e-mail campaigns, testifying before tribunals, filing lawsuits, supporting referenda, collecting signatures for ballot initiatives, peaceful protests and picketing: all public articulation of issues, complaints and interests designed to spur government action qualifies under the petition clause…" *(Copley First Amendment Center)*.

The right to petition includes a negative right to be free from retaliation for, or suppression of, petitioning activity. *See, e.g., BE & K Constr. Co. v. NLRB, 536 U.S. 516, 536 (2002); Prof'l Real Estate Inv'rs, Inc Columbia Pictures Industries, Inc., 508 U.S. 49, 56.60-61 (1993).* The activity of lobbying has been interpreted by court rulings as constitutionally protected free speech and a way to petition the government for the redress of grievances, two of the freedoms protected by the First Amendment of the Constitution. *United States v. Harriss, 347 U.S. 612 (1954), United Mine Workers of America, District 12 v. Illinois State Bar Association Et Al., 389 U.S. 217 (1967),  Railroad Trainmen v. Virginia Bar, 377 U. S. 1 (1964*), and *NAACP v. Button, 371 U. S. 415 (1963).*

*I*n *United Mine Workers of America v. Illinois State Bar Association* (1967), the Supreme Court exalted the right as "among the most precious liberties safeguarded by the Bill of Rights" and implicit in "the very idea of government." The Court had earlier affirmed the right to engage in such activity; it thus deemed it a fundamental liberty, protected against encroachment by federal, state and local governments. Hence, in *NAACP v. Button* (1963), it formed the conceptual basis for the Court's ruling that a civil rights group could not be barred from soliciting people to serve as litigants in civil rights cases. The Court declared: "Litigation may well be the sole practical avenue open to a minority to petition for a redress of grievances." *Id.*

## JURISDICTION

This court has subject matter jurisdiction over Plaintiffs' claims arising under federal law pursuant to 42 U.S.C. §1983.  Plaintiffs further allege that the exercise of this court's jurisdiction over such claims is proper under the rule of *Ex Parte Young*, *209 U.S. 123 (1908)* (plaintiffs alleging violation of federal law may seek prospective injunctive relief against responsible state official).

## STATEMENT OF FACTS

*Ubi jus ibi remedium* — "where there is a right, there should be a remedy. *Akhil Reed Amar, Of Sovereignty and Federalism, 96 YALE L.J. 1425, 1485-86 (1987)* The equitable analogue of this legal maxim is "equity will not suffer wrong without a remedy." *John Norton Pomeroy, A Treatise On Equity Jurisprudence as Administered in the United States of America Adopted for All the States and to the Union of Legal and Equitable remedies Under the Reformed Procedure* § 423 (Spencer W. Symons ed., 5th ed. 1941).

The right of Plaintiffs to attend the State Capital to engage in their constitutional right to lobby Legislators is at the heart of this action. The preclusive nature of these arbitrary and

capricious emergency orders precluding them from engaging in same, at this juncture, over eleven months after a declaration of emergency is a dilatory tactic by Defendants to preclude Plaintiffs from exercising the right to Petition and engage in free speech as delineated *infra*.

## A.     STRUCTURE OF THE NEVADA LEGISLATURE

The Nevada Legislature is a bicameral body, consisting of the lower house, the Assembly, with 42 members, and the upper house, the Senate, with 21 members.  The Legislature's first official working day is the first Monday of February following the election. Sessions of the Legislature are biennial, occurring during odd number years. The 81st Legislative Session for 2021 year commenced on February 1, 2021.

The Legislature must adjourn *sine die* each regular session not later than midnight Pacific Daylight Time (PDT) 120 calendar days following its commencement. Any legislative action taken after midnight PDT on the 120th calendar day is void unless it occurs during a special session convened by the Governor of Nevada.

## B.     THE LEGISLATIVE COUNSEL BUREAU AND LEGISLATIVE COMMISION

Created in 1945, the Legislative Counsel Bureau is a nonpartisan centralized agency serving both houses and members of all political parties with the purpose of administration of the State Capital Building among other purposes. The Legislative Counsel Bureau consists of the Legislative Commission, an Interim Finance Committee, a Director, an Audit Division, a Fiscal Analysis Division, a Legal Division, a Research Division, and an Administrative Division.

The Nevada Legislative Counsel Bureau's Executive Director is selected by the Nevada Legislative Commission. Defendant BRENDA ERDOES was selected and voted on by the Legislative Commission as Executive Director on February 26, 2020.

The Legislative Commission (NRS 218E.150[2])  supervises the Legislative Counsel Bureau. The Commission is a body of 12 legislators, six from each house. The Commission also takes actions on behalf of the legislative branch of government when the full Legislature is not in session. This body meets every few months between sessions to provide guidance to staff of the Legislative Counsel Bureau and to deal with other interim matters.

The administration of the State Capital building and access thereto is the responsibility of the Legislative Counsel Bureau and/or the Legislative Commission. Access to the State Capital and denial thereof is wholly the realm of Legislative Counsel Bureau and/or Legislative Commission, whether it is with or without Emergency Orders and Directives.

## C.     POST COVID-19 SPECIAL 2020 SESSIONS

Nevada's Constitution, Article V § 9 provides that, "|T]he Governor may, on extraordinary occasions, convene the Legislature by Proclamation and shall state to both houses, when organized, the business for which they have been specially convened." During

---

[2] **NRS  218E.150   Creation; membership; vacancies; officers; terms.**
   1.   There is hereby created in the Legislative Counsel Bureau a Legislative Commission consisting of 12 members.
   2.   At each regular session:
   (a)  The Senate shall, by resolution, designate six Senators as regular members of the Legislative Commission and six Senators as alternates; and
   (b)  The Assembly shall, by resolution, designate six members of the Assembly as regular members of the Legislative Commission and six members of the Assembly as alternates.
   3.   The Legislature shall determine by a joint rule at each regular session:
   (a)  The method of determining the majority party and the minority party regular and alternate membership on the Legislative Commission.
   (b)  The method of filling vacancies on the Legislative Commission.
   (c)  The method of selecting the Chair.
   (d)  The term of office of the Chair.
   4.   The members of the Legislative Commission serve until their successors are appointed by resolution as provided in this section, except that the membership of any member who does not become a candidate for reelection or who is defeated for reelection:
   (a)  Terminates on the day next after the general election; and
   (b)  The vacancy must be filled as provided by the joint rule adopted pursuant to subsection 3.

the 2020 year, the Governor of the State of Nevada, along with Emergency Orders issued, convened two Special Sessions of the Legislature.

The 31st (2020) Special Session of the Nevada Legislature began on July 8, 2020, at 10:03 AM, and adjourned *sine die* on July 19, 2020, at 7:13 PM as Governor convened the Legislature by Proclamation under Article V Section 9 to consider the following initiatives:

1. Reducing, reserving, or cancelling certain general fund appropriations made during the 80th Session of the Nevada Legislature to fund operating budgets.

2. Amendments to Nevada Revised Statutes § 362.100 et seq. to accelerate and advance the payment schedule of the tax on the net proceeds of minerals.

3. Transfers to the State General Fund certain amounts from certain funds and accounts including, but not limited to, the Healthy Nevada Fund.

4. Providing flexibility for the Department of Health and Human Services to transfer funds among various accounts in the same manner and limits as allowed for work programs under NRS 353.220.

5. Providing flexibility for restoration of programs, services and any other reductions approved in the special session in the event Nevada receives federal funding to assist with the impact on the state budget caused by the COVID-19 pandemic.

6. Any other actions directly related to solutions for the projected general fund revenue shortfall for the current biennium.

7. Amendments to Chapter 388G to allow local school districts to carry forward yearend balances to the following school year.

8. Amendments to Chapter 396 of Nevada Revised Statutes governing the Millennium Scholarship to authorize the Nevada Board of Regents to implement temporary waivers or modifications of the continuing eligibility requirements for recipients of the Millennium Scholarship during the period of the COVID-19 emergency. Require the submission of a report to the Governor and the Director of the Nevada Legislative Counsel Bureau no later than February 1, 2021, setting forth in detail any temporary actions taken by the Board of Regents and the impact of such actions on Millennium Scholarship recipients.

It is significant to note, that lobbyists were denied access to the State Legislative Building or Members physical offices during the 31st Special Legislative Session.  Following an apparent inability to address all matters in the closed 31st Special Legislative Session, Defendants held a Second closed Special Legislative Session.

The 32nd (2020) Special Session of the Nevada Legislature began on July 31, 2020, at 10:28 AM, and adjourned *sine die* on August 6, 2020, at 12:21 AM.  The Second Legislative Session dealt with a slew of expanded issues, many having nothing to do with the emergent need for the Governor and Legislature to address in an Emergency Session.

The 32nd Special Session, per Proclamation was called for the following matters:

1. *Legislation, as requested by the Legislative Counsel Bureau of the Nevada Legislature, to correct clerical, typographical, and other related errors in S.B. 151, A.B. 431, and S.B. 161 passed during the 8O'h Session of the Nevada Legislature. [Emphasis added]*

2. Legislation to revise Chapter 612 and other appropriate chapters of Nevada Revised Statutes governing unemployment insurance and related matters to allow the Employment Security Division to contact applicants and unemployment benefit recipients by electronic mail and to expedite payment of benefits with good cause, among other potential flexibility enhancing mechanisms.

3. *Social justice reform legislation, including revisions to Senate Bill 242 (2019) at the request of the bill's primary sponsor, amending peace officer conduct standards regarding the use of force; liability for misuse of force; protecting the public right to film and otherwise record police activity as a means of ensuring accountability of peace officers; and other items related thereto. [Emphasis added]*

4. Legislation to revise Chapter 293 and other appropriate chapters of the Nevada Revised Statutes governing elections to ensure Nevadans can exercise their fundamental right to vote during a state of emergency and tn [*sic]* a way that does not dangerously expose them to increased risk of COVID 19 infection by guaranteeing every active registered voter receive a mail ballot while ensuring a sufficient number of in-person polling locations to vote in person for the 2021) General Election.

5. Legislation, as requested herein by the Governor, to effectuate liability protections to certain persons, not for-profit entities, state government and its subdivisions, schools. including elementary, middle, and high schools and institutions of higher education, and businesses substantially complying with Controlling Health and Safety Standards from claims and liabilities related to COVID-19 and to amend Title 40 and, potentially, Title 41 of Nevada Revised Statutes to ensure the protection of the health and safety of hotel, motel, casino-resort, and other employees during the current COVID-19 pandemic.

6. Legislation, as requested by the Nevada Legislative Counsel Bureau, to ensure participation from members who are predisposed to acute illness resulting from the existing COVID-19 pandemic and in order to encourage and foster participation in committee meetings by enabling individuals to attend, participate, vote or take action using secure remote technologies. This legislation should also provide that if the Legislature passes any proposed constitutional amendments for a first rime during a special session, the Director of the Legislative Counsel Bureau shall immediately cause the full text of the proposed amendment in the form approved to be published in a separate printed volume of statutes. Finally, this Legislation shall provide the Nevada Legislature with authority necessary to effectuate any restructuring ofthe *[sic]*Legislative Counsel Bureau the Nevada Legislature deems necessary to the effective and efficient conduct of its duties.

7. Legislation to provide authority for the Judicial Branch to implement alternative dispute resolution measures for evictions actions to mitigate the harm resulting from the COVID 19 recession and the dramatic unemployment resulting from it.

It is significant to note, that lobbyists were again, denied access to the State Legislative Building or Members offices during the 32nd Special Legislative Session.

Again, On February 1, 2021, Nevada's 81st Legislative Session began, with lobbyists denied access to the State Capital and engage in lobbying activities. The laws regarding Lobbying in the State of Nevada are codified in Chapter 218H of the Nevada Revised Statute entitled Lobbying and delineates the registration process accordingly. As of the date of this Complaint, not a single person has officially registered with the Legislative Counsel Bureau to lobby during the 81st Legislative session.

Nevada law defines a **lobbyist** as someone who both "communicates directly with a member of the Legislative Branch on behalf of someone other than himself or herself to

17

influence legislative action" and "appears in person in the Legislative Building" or other building where a legislative committee meets." *NRS 218H.080.*

Anyone who acts as a lobbyist is supposed to register with the Legislative Counsel Bureau within two days after beginning lobbying activity. *NRS 218H.200.* In normal, non-pandemic times, Lobbyist register with the Legislative Counsel Bureau and appear on an online registry where their information and clients are listed.

But as the building is closed to the public and to lobbyists, Plaintiffs are denied access to enter the building and register under the normal processes. Only lawmakers, staff and a small number of reporters are allowed in the building Additionally, Plaintiffs are not considered a lobbyist until they are physically in the building, regardless of any advocacy for legislation they may engage in virtually or over the phone.

During the 2021 legislative session, lobbyists are precluded from registering on the website  www.leg.state.nv/Lobbyist/ , precluding in person contact with legislators and discuss pending issues as lobbyists.

NRS 218H.020 requires that the fullest opportunity be afforded to the people to petition their government for the redress of grievances and to express freely to individual Legislators and to legislative committees their opinions on legislation. NRS 218H.080(2) states that a *Lobbyist* does not include a Persons who confine their activities to formal appearances before legislative committees and who clearly identify themselves and the interest or interests for whom they are testifying.

Defendants have unilaterally eradicated the right to Petition since Plaintiffs in this matter cannot communicate and lobby directly in person with the Legislature, for now. the ***third consecutive* Legislative Session** under the auspices of "emergency orders". Defendants have further eradicated the requirements under NRS 218H.200 since registration is not

available during the session, and no one may be in the building as a "lobbyist" or lobby

legislative representatives and staff.

Article 4 § 15 of the Nevada Constitution entitled *Open sessions and meetings;*

*adjournment for more than 3 days or to another place*, provides  "[T]he doors of each House

shall be kept open during its session, and neither shall, without the consent of the other,

adjourn for more than three days nor to any other place than that in which they may be

holding their sessions. The meetings of all legislative committees must be open to the public,

except meetings held to consider the character, alleged misconduct, professional competence,

or physical or mental health of a person." *Id.*

## LEGAL AUTHORITY

A.      STANDING

Three elements make up the "irredicible constitutional minimum of standing": (1)

injury in fact; (2) a causal connection between the injury and the conduct complained of; and

(3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of*

*Wildlife, 504 U.S. 555, 560–561 (1992).*

A plaintiff threatened with future injury has standing to sue if the threatened injury is

certainly impending, or there is a substantial risk the harm will occur. *In re Zappos.com, Inc.,*

*888 F.3d 1020, 1024 (9th Cir. 2018) (quoting Susan B. Anthony List v. Driehaus, 573 U.S.*

*149, 158 (2014)).* A plaintiff may not rely "on mere conjecture about possible governmental

actions" to demonstrate injury, and must instead present "concrete evidence to substantiate

their fears." *Clapper v. Amnesty Int'l USA, 568 U.S. 398, 420 (2013).* "Past exposure to illegal

conduct does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons, 461*

*U.S. 95, 102 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974)).*

All Plaintiffs in this action have standing to bring these claims. Attached hereto are Declarations delineating precisely, the injuries of fact pending during this legislative session. Accordingly, all four Plaintiffs herein have standing to pursue this action and request this Court address the pending constitutional matters and issue a preliminary injunction in their favor.

**B.      ISSUE OF FIRST IMPRESSION**

This case presents an issue of first impression. In a common law system based on the evolution of judicial precedent,[3] this phrase has power. It suggests an elusive situation that has somehow evaded the courts, or an important event never seen before by judges. Definitionally, it means an absence of controlling precedent, such that a court must use persuasive authority or some other analytical technique to answer the question before it.[4]

As the legal challenges relating to State Governments' responses to the COVID-19 pandemic and the effect on civil liberties during this fluid period, there were no precedents on certain matters effecting said civil liberties until the Courts issued a variety of opinions regarding same. *See Aces Enterprises LLC v. Edwards 0:20-cr-30526; 842 Morrison Road Corp. v. Tri-County Health Department 2020CV31347 Adams and Boyle, P.C. v. Slatery 3:15-cv-00705; Adrian School District Board v. Gill; 20CV31597 Roman Catholic Diocese of Brooklyn New York, v Andrew M. Cuomo, Governor of New York, 592 U.S. _____(2020). Calvary Chapel Dayton Valley v Sisolak*, 591 U.S. ___(2020); *South Bay United Pentecostal Church v Newsom*, 590 U.S. __(2020).

--------------------------

[3] Empirically Testing Dworkin's Chain Novel Theory: Studying the Path of Precedent, 80 NYU L. Rev. 1156 (2005) [Path of Precedent].
[4] *See* BLACK'S LAW DICTIONARY 243 (9th ed. 2004) (defining "case of first impression" as: "A case that presents the court with an issue of law that has not previously been decided by any controlling legal authority in that jurisdiction."); see also Path of Precedent, 80 NYU L. Rev. at 1129.

This fraction of cases that dealt with matters such as First Amendment rights, Fifth and Fourteenth Amendment due process and various other constitutional questions have forced courts across the nation to issue decisions on matters of first impression that remain unprecedented in this Country.

This case joins that list of issues of first impression on the basis that never has this Court been placed in the position of treating the rights of lobbyists in the position that this pandemic has placed them.

## C.      STANDARD FOR INJUNCTION

A motion for a preliminary injunction is governed by the multi-factor test outlined by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008).* Under the *Winter* test, the plaintiff has the burden to establish: (1) likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *Id.* Likelihood of success on the merits is a threshold inquiry and the most important factor. *See, e.g., Edge v. City of Everett, 929 F.3d 657, 663 (9th Cir. 2019).*

Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. *NRDC v. Winter, 518 F.3d at 677 (internal citations omitted).*[5]

_____

[5] Justice Ginsburg penned an eloquent dissent in *Winter,* where, among other things, she addressed the question of whether the majority opinion eviscerated a court's ability to issue an injunction when the likelihood of irreparable harm was less than clear: Consistent with equity's character, courts do not insist that litigants uniformly show a particular, predetermined quantum of probable success or injury before awarding equitable relief. Instead, courts have evaluated claims for equitable relief on a "sliding scale," sometimes awarding relief

In our circuit, there is no presumption that the issuance of a preliminary injunction requires an evidentiary hearing.  *See Int'l Molders' & Allied Workers' Local Union v. Nelson, 799 F.2d 547, 555 (9th Cir. 1986).* Further, review of a grant of a preliminary injunction for abuse of discretion.  *See, e.g., United States v. California, 921 F.3d 865, 877 (9th Cir. 2019).* "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law."  *Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).*

### 1.    *Likelihood of Success on the Merits*

Plaintiffs are likely to prevail on the merits, or at least have raised a serious question to the merits of their procedural and substantive due process claims against Defendants. To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a federal right by a person acting under color of state law.  In *McDonald v. Smith, 472 U.S. 479 (1985),* the  Supreme Court case held that the right to petition does not provide absolute immunity to petitioners; it is subject to the same restrictions as other First Amendment rights.

The Ninth Circuit has repeatedly stated that "[t]o obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest protected by the constitution; (2) a deprivation of the interest by the government; 3) lack of process."  *See Shanks v Dessel, 540 F.3d 1082, 1090 (9ᵗʰ Cir. 2008).*

Procedural due process concerns are not satisfied simply by providing notice and a hearing. The Ninth Circuit has firmly ruled that procedural due process is violated when an

_____

based on a lower likelihood of harm when the likelihood of success is very high....  This Court has never rejected that formulation, and I do not believe it does so today.  *Id. at 392 (Ginsburg, J. dissenting) (internal citations omitted).*

1

2

3

adjudicative decision maker deprives a person of protected property interests on the grounds of bias, prejudice, partiality, or maliciousness, regardless of whether there was notice and/or a hearing. *Clements v Airport Authority of Washoe County, 69 F.3d 321, 333 ( 9th Cir. 1995).*

4

5

6

Here, Plaintiffs are precluded from entering the State Capital to exercise their First Amendment rights of Freedom of Speech and the Petition Clause.

7

8

9

10

11

In *American Trucking Associations v. City of Los Angeles*, the Ninth Circuit referenced *Winter* in its application of the traditional test and held that "as the Court explained, an injunction cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be." *See Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (emphasis added).*

12

13

14

15

16

17

18

19

20

21

22

The Supreme Court made clear in *Winter* that the balancing of harms, and review of the public interest, must occur in the context of the specific relief requested. *Winter v. Natural Res. Def. Council (Winter), 129 S. Ct. 365, 376 (2008).* This approach was applied by the Ninth Circuit in *Sierra Forest Legacy v. Rey*, when it overturned a district court's denial of preliminary injunctive relief for failure to analyze the balancing of harms and public interest in the context of the narrow injunction requested by environmental plaintiffs. *Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1022–23 (9th Cir. 2009) (citations omitted) ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction.").*

23

24

25

26

27

Here, every day that passes during this 120 legislative session with the State Capital being closed to Plaintiffs, directly and irreparably harms Plaintiffs by precluding them from having in person access to the Legislators and allowing them to engage in active, in-person lobbying.

28

23

**D.    DEFENDANTS' ACTIONS VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS UNDER THE 5TH AND 14TH AMENDMENT AND THE PETITION AND FREE SPEECH CLASUES OF THE 1ST  AMENDMENT**

While not explicitly defined in the U.S. Constitution, the Supreme Court has "acknowledged that certain unarticulated rights are implicit in enumerated guarantees…. Yet these important but unarticulated rights [association, privacy, presumed innocent, etc.] have nonetheless been found to share constitutional protection in common with explicit guarantees." *Richmond Newspapers, Inc. v. Virginia*, *448 U.S. 555, 579-580 (1980).*

The word "Lobby" do not exist in the United States Constitution. But, as delineated *infra*, the Supreme Court has repeatedly held that lobbying is a form of protected speech and falls under the Petition Clause of the First Amendment. Accordingly, the Orders and Emergency Directives, and Defendants' enforcement thereof, violate Plaintiffs' substantive due process rights secured by the Fourteenth Amendment to the U.S. Constitution.  Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law."  The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights.  *See Duncan v. Louisiana*, *391 U.S. 145, 147-149 (1968).*

It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)); see also, e.g., Assoc. Press v. Otter, 682 F.3d 821, 826 (9th Cir. 2012)* ("The loss of First Amendment freedoms, ***even for minimal periods of time***, unquestionably constitutes irreparable injury.") *[Emphasis added]*.

"It is always in the public interest to prevent the violation of a party's constitutional rights." *.Padilla v. Immigration &. Customs Enforcement,* 953 F.3d *1134,* 1147–48 *(9th Cir. 2020) (internal quotation marks omitted).* When weighing public interests, courts have

24

"consistently recognized the significant public interest in upholding First Amendment principles." *Assoc. Press, 682 F.3d at 826* (quoting *Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 974 (9th Cir. 2002)*, abrogated on other grounds by *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)*.

### 1.   *Defendants Closure of the State Capital Violates the Free Speech and Petition Clauses of the First Amendment*

The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the *freedom of speech*, or of the press; or the right of the people peaceably to assemble, and to *petition the Government for a redress of grievances. [Emphasis added] Id.*

In *Gitlow v New York 268 US 652 (1925)*, the Supreme Court applied protection of free speech to the states through the due process clause of the Fourteenth Amendment. Additionally, this was also confirmed in as a variant in  *Buckley v. American Constitutional Law Foundation, Inc.*, *525 U.S. 182 (1999),* the Supreme Court case that dealt with the authority of states to regulate the electoral process, and the point at which state regulations of the electoral process violate the First Amendment freedoms.

Similarly, in *Index Newspapers v. U.S Marshals*, *Service, No. 20-35739 (9th Cir. 2020)*, the Ninth Circuit cites to *Press-Enterprise II*, the Supreme Court articulated a two-part test to determine whether a member of the public has a First Amendment right to access a particular place and process. *Press-Ent. Co. v. Superior Court of Cal., 478 U.S. 1 (1986).*

First, a court must ask "whether the place and process has historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Id. at 8.* If a qualified right of access exists, the government can overcome that right and bar the public by showing that it has "an

overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id. at 9.*

Here, it is indisputable that Plaintiffs have had access to the State Capital building and have entered the building to lobby prior to COVID-19 closures. It is also indisputable that the spirit of petitioning the government exists through lobbying during legislative sessions and without in-person access to the legislative body and fellow lobbying colleagues, the right to petition the government becomes insignificant.

The Ninth Circuit in *Fed. Election Comm'n v. Furgatch, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989).* instructs courts to consider five factors when determining whether conduct is likely to occur in the future: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and (5) the sincerity of any assurances against future violations. *Id.*

The 120-day Legislative Session commenced on February 1, 2021, and it has been made abundantly clear that Defendants have no intent to allow Plaintiffs in the State Capital as their Constitutional rights afford them to do. Defendants declaration of a State of Emergency in March 2020, is no longer an emergency over eleven months later. Defendants are engaging in deliberate and unconscionable conduct at this juncture to preclude Plaintiffs from engaging in lobbying activities despite any empirical data demonstrating an emergency for such preclusive action.

Because Defendants' decisions in issuing the Emergency Directives were made in reliance on procedurally deficient and substantively lawful processes, Plaintiffs were directly

and proximately deprived of their property and liberties, and consequently, their ability to

lawfully lobby the Legislature without unconstitutional government overreach.

Furthermore, because Defendants' decisions were made in reliance upon an arbitrary

and capricious interpretation of the Nevada Constitution and related laws and statutes with

respect to their ability to order a closure of the State Capital and eradication of lobbying,

Plaintiffs are suffering irreparable harm and are deprived of their property rights and liberties

absent substantive due process of law, in violation of the Fourteenth Amendment to the U.S.

Constitution.

**2.** ***Defendants Closure of the State Capital Fails Strict Scrutiny Review as it is Not Necessary to Further a Compelling Government Interest***

At its core, the Free Speech and Petition Clauses of the First Amendment to the U.S.

Constitution function as a constitutional guarantees that no person or group will be denied

their protection under the law that is enjoyed by millions of Americans. The Supreme Court

has recognized that the First Amendment's protections extend to individual and collective

speech "in pursuit of a wide variety of political, social, economic, educational, religious, and

cultural ends." *Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984).*

The Supreme Court has long considered political and ideological speech to be at the

core of the First Amendment, including speech concerning "politics, nationalism, religion, or

other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).*

Political speech can take other forms beyond the written or spoken word, such as

money, *e.g., Buckley v. Valeo, 424 U.S. 1 (1976) (per curiam),* or symbolic acts, e.g., *Texas v. Johnson, 491 U.S. 397 (1989).* A government regulation that implicates political or

ideological speech generally receives strict scrutiny in the courts, whereby the government

must show that the law is narrowly tailored to achieve a compelling government interest. *Id.*

The Orders and Emergency Directives, and Defendants' enforcement thereof, violate the First Amendment, both facially and as-applied to Plaintiffs.  Strict scrutiny applies where, as here, the classification impinges on a fundamental right – the right to free speech and the right to petition the Government for a redress of grievances, among others.

Defendants cannot satisfy strict scrutiny because their arbitrary actions are not narrowly tailored measures that further compelling government interests, for the reasons stated above.

Indeed, the closure of governmental proceedings has been deemed proper in several instances where the government's interest was arguably less immediate and the restriction on access was equally broad. *Cf., e.g., Dhiab v. Trump, 852 F.3d 1087, 1095 (D.C. Cir. 2017)* (government's interest in preventing future threats to military operations would justify closure of habeas proceedings); *U.S. v. Index Newspapers LLC, 766 F.3d 1072, 1087 (9th Cir. 2014)* (government's interest in secrecy justified closure of certain grand jury proceedings); *ACLU v. Holder, 673 F.3d 245, 252 (4th Cir. 2011)* (government's interest in integrity of ongoing fraud investigation justified sealing of complaints filed in False Claims Act actions).

Turning to the Nevada Constitution, since 1864, the Nevada Constitution has provided intrinsic and unalienable rights and liberties to its citizens.  Chief among those rights and liberties are those found in Article I of the Nevada Constitution.  Article I, §1, of the Nevada Constitution provides, in pertinent part, that "[a]ll men are by Nature free and equal and have certain inalienable rights among which are those of enjoying and defending life and liberty; Acquiring, Possessing and Protecting property and pursuing and obtaining safety and happiness…"

Similarly, Article I, §9, provides that every citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.

Additionally, Article I §10, provides that the people shall have the right freely to assemble together to consult for the common good, to instruct their representatives and to petition the Legislature for redress of Grievances.

Defendants' Orders and Emergency Directives interfere with Plaintiffs' rights and liberties as set forth under Article I, § 1, 9, and 10, of the Nevada Constitution by precluding them from attending the State Capital and engaging in lobbying activities.

Defendants' Orders and Emergency Directives have caused irreparable harm to Plaintiffs' as lobbyists which will continue to have deleterious effects unless and until Defendants are enjoined by this Court from enforcing their respective Orders and Emergency Directives. Requiring Plaintiffs to abstain from conducting lawful in person lobbying in the State of Nevada, despite other compliance measures being taken to satisfy the public health interests at stake, violates their Nevada Constitutional liberty rights.

**3.    *Defendants Must Open the State Capital and Allow Access to the Public and Lobbyists as There is No Justification for Alternative Means***

Article 4, § 15, of the Nevada Constitution provides "[T]he doors of each House shall be kept open during its session, and neither shall, without the consent of the other, adjourn for more than three days nor to any other place than that in which they may be holding their sessions. The meetings of all legislative committees must be open to the public, except meetings held to consider the character, alleged misconduct, professional competence, or physical or mental health of a person."

Defendants have violated Article 4 §15 by denying access to Plaintiffs by keeping the State Capital closed to access by Plaintiffs. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their Constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders and Emergency Directives.

**E.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPERABLE HARM**

To obtain a TRO, Plaintiffs must show they will suffer irreparable harm in the absence of the order. *Winter, 555 U.S. at 20.* The Supreme Court has recognized that "the violation of loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373 (1976).* Notwithstanding same Plaintiffs' First Amendment rights to free speech and petition to the government for redress allow for immediate injunctive relief.

As stated *supra,* the 81st Legislative Session is 120 days, with 23 days which have already passed. Plaintiffs are entitled to in-person access to their legislators and the State Capital and the preclusion of same has caused irreparable harm to Plaintiffs collectively.

**F.     BALANCE OF EQUITIES FAVORS PLAINTIFFS**

**1.     *The Closure of the State Capital to Plaintiffs is not Narrowly Tailored***

Evaluating whether a government measure is narrowly tailored is not simply a matter of ordinary fact-finding, however. Narrow tailoring is viewed as a mixed question of fact and law that requires a delicate balancing of legal principles as applied to specific circumstances. *See Gilbrook v. City of Westminster, 177 F.3d 839, 861 (9th Cir. 1999); Gerritsen v. City of Los Angeles, 994 F.2d 570, 575 (9th Cir. 1993)* ("[W]e review First Amendment questions de novo since they present mixed questions of law and fact, requiring us to apply principles of First Amendment jurisprudence to the specific facts of this case." *(internal quotation marks*

*omitted)); see also Mastrovincenzo v. City of New York, 435 F.3d 78, 100 (2d Cir. 2006)*
("Our narrow-tailoring inquiry requires us to apply principles of First Amendment
jurisprudence to the specific facts of this case, and therefore we treat this issue as a mixed
question of law and fact that we may resolve on appeal." (internal quotations marks omitted));
*Casey v. City of Newport, R.I., 308 F.3d 106, 116 (1st Cir. 2002)* ("Inescapably, the
application of the narrow tailoring test entails a delicate balancing judgment." (citations
omitted))

In *Meyer v. Grant, 486 U.S. 414 (1988)* the Supreme Court stated that the statute, in
question, burdens such speech in two ways: First, it limits the number of voices who will
convey appellees' message and the hours they can speak and, therefore, limits the size of the
audience they can reach. Second, it makes it less likely that appellees will garner the number
of necessary signatures, thus limiting their ability to make the matter the focus of statewide
discussion. The statute's burden on speech is ***not relieved by the fact that other avenues of
expression remain open to appellees***, since the use of paid circulators is the most effective,
fundamental, and perhaps economical means of achieving direct, one-on-one communication,
and appellees' right to utilize that means is itself protected by the First Amendment. Nor is the
statutory burden rendered acceptable by the State's claimed authority to impose limitations on
the scope of the state-created right to legislate by initiative; the power to ban initiatives
entirely does not include the power to limit discussion of political issues raised in initiative
petitions. *[Emphasis added] Meyer at 486 U. S. 420-425.*

Here, Defendants cannot justify the reason for providing Plaintiffs an alternative
means of lobbying. There are sufficient measures and vaccines to be taken as to adherence of
distancing guidelines and the failure to afford Plaintiffs access to the State Capital is simply a
demonstration of blatant violation of Plaintiffs rights.

Plaintiffs must also show that the balance of equities tips in their favor. *Winter, 555 U.S. at 20.* Plaintiffs have shown that they will be harmed by a deprivation of the constitutional right to petition their government and lobby their legislators during the 120 day 81st Legislation Session and have further explained in detail their lobbying practices in attached Declarations.

Plaintiffs recognize that the current pandemic presented an unprecedented health crisis in Nevada, and in this Country. The Governor has an immense and sobering responsibility to act quickly to protect the lives of Nevadans from a deadly epidemic. Keeping in mind that the this is now the third legislative session that the public and lobbyist as Plaintiffs are, are precluded from entering the State Capital, Defendants acts are now, over eleven months after declaring a State of Emergency, arbitrary and capricious and a blatant violation of Plaintiffs' Constitutional rights.

## G.    AN INJUNCTION IS IN THE PUBLIC INTEREST

Lastly, to obtain a TRO, Plaintiffs must show that the granting of a TRO is in the public interest. *Winter, 555 U.S. at 20.* The public interest is furthered by preventing the violation of a party's constitutional rights. *Free the Nipple v, City of Ft. Collins, Colo, 916 F.3d 792 (2019).* Additionally, for the reasons previously mentioned, the closure of the State Capital violates the Article 4 § 9 of the Nevada Constitution.  Notwithstanding same, Plaintiffs are entitled to lobby their State officials under the First Amendment.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights*." Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd'* sub nom. *Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) (quotations omitted).* Because the requested injunction will accomplish this, the public interest also favors an order

protecting Plaintiffs making the grant of an injunction in this case a matter of overwhelming public interest.

## **CONCLUSION**

Plaintiffs agree that no one, has a right "to expose the community…to communicable disease." *Jacobson v. Massachusetts, 197 U.S. 11, 27 (1905). Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944).* But the arbitrary closure of the State Capital, over eleven months after a declaration of emergency combined with the access to vaccinations for the pandemic, to prevent Plaintiffs from engaging in their First Amendment rights to free speech and petition their legislators leaves Defendants with no good answers.

Accordingly, Plaintiffs request an injunction be issued as follows:

1.    Permanently enjoin Defendants and all persons and entities in active concert or participation with Defendants from the arbitrary and dilatory closure of the State Capital .

2.    Issue an Order mandating that Defendants immediately allow Plaintiffs and other members of the public petition their State officials in person;

3.    Issue an Order mandating that the State Capital be open to the public and Plaintiffs as required in Article 4 Section 15 of the Nevada Constitution.

4.    Issue an Order that all compliance must adhere to the social distancing requirements mandated by the Nevada COVID-19 playbook.

DATED this  24th  day of February 2021.

**CHATTAH LAW GROUP**

/s/ S. CHATTAH
SIGAL CHATTAH, ESQ.
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #203
Las Vegas, Nevada 89118
Tel.:(702) 360-6200
*Attorney for Plaintiffs*

# DECLARATIONS IN SUPPORT OF MOTION

### DECLARATION OF JANINE HANSEN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, JANINE HANSEN, declare as follows:

1.   I am a Plaintiff in this case.

2.   The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I would and could competently do so under oath.

3.   I have been at all times relevant herein a lobbyist in the State of Nevada

4.   I have been a citizen lobbyist since I was in college, first appearing at a Legislative hearing in 1971.

5.   I have participated as a citizen lobbyist every session since that time.

6.   It is very difficult for average citizens to constantly monitor the Legislature.

7.   They are trying to earn a living, taking care of their children, live far away from Carson and have no experience lobbying and don't know what to do.

8.   I have provided a link for decades for average people to know what bills will most significantly affect them, how they can contact the Legislators and express their opinions, because I have been in the legislative building following legislation, talking personally with Legislators as I catch them in the hall, attending hearings, seeing the little things that give an indication of where an individual legislator or the committee might be on a particular issue.

9.   I then am able to share that information with grass roots people who want to be involved with the Legislature.

10.   Citizen lobbyists like me who focus on citizen activism at the Legislature are severely handicapped by being shut out of the Legislative building.

11.   It is difficult for citizens to navigate trying to participate by phone.

35

12. Just this morning I spent ½ hour trying to help one person figure out how to sign up for a hearing. It simply becomes impossible for many to participate.

13. In addition, the Legislators are limiting testimony to 2 minutes and severely limiting the number of people who can testify.

14. Just the other day they limited testimony to just 10 minutes.

15. Many people were very upset and called in on public comment to complain and share their concerns. Some were just cut off.

16. The closing of the Legislative building is a way for Legislators to squelch public participation in the Legislative process. Public participation is the only significant way that we have of influencing the Legislators.

17. By closing the building they have greatly harmed our ability to participate in the Legislative process as citizens.

18. I am seeking an immediate Order from this Court to allow myself and others to access legislators in person to exercise my first amendment freedoms.

19. The 81st Legislative Session started on February 1, 2021, and we have already lost three weeks in a 120 day session.

20. These are the facts as I know them to be true.

21. Under NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 23rd day of February, 2021.


 /s/  _Janine Hansen_
Declarant
JANINE HANSEN

## <u>DECLARATION OF SHAWN MEEHAN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

I, SHAWN MEEHAN, declare as follows:

1.   I am a Plaintiff in this case.

2.   I have been at all times relevant herein a lobbyist in the State of Nevada during 2013, 15, 17, 19 legislative sessions.

3.   The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I would and could competently do so under oath.

4.   Experience shows in person interactions and quick hallway conversations of opportunity can facilitate larger, longer meetings where legislators become better informed.

5.   A quick chat or "sneak in" to a legislator's office, many times has yielded the opportunity to walk with them to a committee hearing.

6.   Electronic modes have certainly aided commerce and such in these times, but I have not found a way they can replace these anecdotal, yet essential, in person moments.

7.   COVID-19 is real and some wise protective measures must be observed, but in no way are those measures allowed to interfere with the civil rights of The People.

8.   In person lobbying in the interest of the citizens of Nevada is a constitutional right being denied and in my experience, as discussed above, is an essential part of citizenship and the governance of Nevada in accordance with our US and Nevada Constitutions.

9.      This is now the third Legislative Session which the public is shut out of, and this is a gross violation of my First Amendment rights to free speech and my right to petition the government.

10.     I am seeking an immediate Order from this Court to allow myself and others to access legislators in person to exercise my first amendment freedoms.

11.     The 81st Legislative Session started on February 1, 2021, and we have already lost three weeks in a 120 day session.

12.     These are the facts as I know them to be true.

13.     Under NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 23rd day of February, 2021


 _/s/__Shawn Meehan_
Declarant
SHAWN MEEHAN

## <u>DECLARATION OF MELISSA CLEMENT IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

I, MELISSA CLEMENT, declare as follows:

1.     I am a Plaintiff in this case.

2.     I have been at all times relevant herein a lobbyist in the State of Nevada

3.     The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I would and could competently do so under oath.

4.     To be effective as a grassroots lobbyist, I must be able to mobilize my advocates.

5.     Citizen lobby days, which includes individual Nevada Citizens testifying in person at hearings and interacting with legislators has moved and killed legislation in the past.

6.     Due to the fact that I am precluded from access to the Legislators and the State Capital, this is not happening because the building is missing every stakeholder who will be impacted by each of these bills.

7.     This is now the third Legislative Session which the public is shut out of, and this is a gross violation of my First Amendment rights to free speech and my right to petition the government.

8.     I am seeking an immediate Order from this Court to allow myself and others to access legislators in person to exercise my first amendment freedoms.

9.     The 81st Legislative Session started on February 1, 2021, and we have already lost three weeks in a 120 day session.

10.     These are the facts as I know them to be true.

11.   Under NRS 53.045, I declare under penalty of perjury that the foregoing is true
and correct.

Dated this 23rd day of February, 2021

_/s/   Melissa Clement_
Declarant
MELISSA CLEMENT